IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ERIN R. FLYNN,<br><br>                    Plaintiff,<br><br>vs.<br><br>SIREN-BOOKSTRAND, INC. and<br>DIANA DEBALKO,<br><br>                    Defendants. | 4:13-CV-3160<br><br>MEMORANDUM AND ORDER |

      This matter is before the Court on plaintiff Erin R. Flynn's Motion for Temporary Restraining Order and Request for Hearing (filing 8) and her Motion for Emergency Hearing or, Alternatively, Motion for Reassignment (filing 14). For the reasons discussed below, the Court denies Flynn's motion for a temporary restraining order and denies as moot Flynn's request for an emergency hearing or reassignment to another United States District Judge.

## BACKGROUND

      Flynn (who also goes by the pen names Joyee Flynn and Flynn Eire) began writing books of fiction in 2002. To date, Flynn has authored 107 books, 89 of which were published by defendant Siren-BookStrand ("Siren"). Flynn avers that she typically publishes a new book every 2 weeks, and that she generally sells 5,000 to 6,000 electronic copies within 6 months and approximately 100 to 200 paper copies of each book per year. Filing 9-1 at 1. At this time, she intends to continue writing and publishing new books every 2 weeks. Filing 9-1 at 2.

      In March 2010, Flynn entered into her first publication contract with Siren. Since then, they have signed 88 more separate publication contracts for Flynn's works. According to Flynn, these contracts were all substantially the same, except for the books to be published and the amounts of advances she received. Each contract dealt with one book only. Filing 9-1 at 2, 7. Flynn has attached what she claims is a representative sample of these contracts. Filing 9-1 at 7–19.

      Flynn asserts that under each of her contracts with Siren, she retained sole ownership of the copyright to her books. Filing 9-1 at 2, 11. The contracts further provide that she owns the characters from her works and controls

their use in "sequels or series" books. Filing 9-1 at 3, 11. However, each contract also gave Siren a right of first refusal to publish any book that "is a sequel to the [book] covered in this contract, using an identical theme and/or major characters from the contracted [book.]" Filing 9-1 at 3, 12.

In June 2013, Flynn submitted two manuscripts to Siren for review and publication, entitled *Gideon* and *Trapped and Boiled*. Siren insisted that certain changes be made to both books before they could be published. Rather than make the changes, Flynn decided to publish both books herself. According to Flynn, she first confirmed with David DeBalko, a co-owner of Siren, that neither book was considered a "sequel." Flynn avers that she never received a proposed contract for these two books and that neither book was the subject of a publication contract between her and Siren. Filing 9-1 at 3–4. On July 31 and August 28, respectively, Flynn began selling *Gideon* and *Trapped and Boiled* through Amazon. Filing 9-1 at 3–4. By September 9, Flynn had sold nearly 1,500 electronic copies of *Gideon*, making approximately $115 per day, and over 650 electronic copies of *Trapped and Boiled*, making approximately $148 per day. Filing 9-1 at 4–5.

Then, in late August, Siren notified Flynn that it considered her in breach of 28 previous contracts, as Siren believed both *Gideon* and *Trapped and Boiled* were "sequels" to the books in the previous contracts and because Siren had, in fact, accepted both for publication. Filing 9-1 at 5, 20–23. Siren warned Flynn that if she did not cease selling the books on Amazon, Siren would send Amazon a "takedown" notice under the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 *et seq*. *See* 17 U.S.C. § 512(c). The letters also warned that absent compliance, Siren would withhold royalty payments on 28 of her previous books. Filing 9-1 at 20–23.

On September 9, 2013, Flynn received an e-mail from Amazon informing her that Siren had filed takedown notices regarding both books. Filing 9-1 at 5, 24. At that point, sales of both books on Amazon were suspended. Flynn avers that Siren has yet to withdraw its takedown notices and that her books are still unavailable for sale on Amazon. Filing 9-1 at 6. This suit followed.

## ANALYSIS

In her operative complaint, Flynn asserts two claims for relief. First, Flynn contends that defendants have violated the DMCA's prohibition on knowing misrepresentations in connection with takedown notices. 17 U.S.C. § 512(f). The DMCA contains a number of measures designed to enlist the cooperation of Internet and other online service providers to combat ongoing copyright infringement. *Rossi v. Motion Picture Ass'n of America Inc.*, 391 F.3d 1000, 1003 (9th Cir. 2004). When a copyright owner suspects that his

copyright is being infringed, he may send a takedown notice to the service provider for the site on which the allegedly infringing material is stored. *Id.* To be effective, a takedown notice must include, among other things, a "statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." § 512(c)(3)(A)(v). The provision that Flynn claims defendants have violated, § 512(f), provides that "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing" may be liable for resulting damages incurred by the alleged infringer.

Flynn argues that any takedown notices from Siren regarding *Gideon* and *Trapped and Boiled* necessarily contained knowing misrepresentations and thus violated § 512(f). Flynn avers that she holds the copyright to both works. Filing 9-1 at 6, 25–30. And, she argues, based on their prior dealings, Siren must have known it had no claim to the copyright in either book.

Flynn also disputes Siren's claim that either book was a "sequel" under their previous contracts. She avers that neither is a sequel because neither includes "major characters" or "collective themes" in common with a book of hers published by Siren. Filing 9-1 at 5. Even if the books are sequels, Flynn argues, Siren can claim at most a violation of its right of first refusal. And while that would give rise to a claim for breach of contract, it would not allow Siren to use the DMCA to prevent Flynn from selling her books. Finally, Flynn claims that nothing under her contracts with Siren allows them to withhold royalty payments as a penalty for breach of contract.

Therefore, in her second claim for relief, Flynn seeks a declaratory judgment, requesting that the Court clarify the rights of the parties with respect to both books and declare that she has the right to publish both independent of Siren, that she is the sole copyright owner of both, that she may publish additional books without interference from Siren, and that publication of the books has no bearing on Flynn's right to royalty payments under other contracts with Siren.

On the same day that Flynn filed her amended complaint, she filed the pending motion for a temporary restraining order. Flynn asks the Court to: (1) order defendants to cooperate with her in instructing Amazon to restore access to *Gideon* and *Trapped and Boiled* on its site; (2) enjoin defendants from interfering further with her efforts to publish these books; (3) enjoin defendants from withholding royalty payments for previous Siren publications; and (4) enjoin defendants from interfering with her ability to publish other non-sequels through means other than Siren. Filing 8.

Flynn alleges that on September 18, 2013, defendants filed a separate action in Texas state court, and are seeking some manner of (unspecified)

immediate injunctive relief. Filing 14 at ¶¶ 5–6. In light of this recent development, Flynn requests that an emergency hearing be held on her motion for a temporary restraining order, no later than September 20. Flynn also requests that, if necessary, the case be reassigned to another United States District Judge in order to hold the hearing without delay. Filing 14 at ¶¶ 8–9.

The Court first considers Flynn's motion for a temporary restraining order. Because the Court finds that Flynn is not entitled to injunctive relief at this time, Flynn's motion for an emergency hearing or reassignment is denied as moot.

### I. Flynn's Request for Entry of a Temporary Restraining Order

When deciding whether to issue a temporary restraining order, the Court turns to the four *Dataphase* factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on the nonmovant and other parties; and (4) the public interest. *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). A temporary restraining order is an extraordinary remedy, and the movant bears the burden of establishing its propriety. *Roudachevski*, 648 F.3d at 705. Flynn has not met this burden.

Specifically, the Court finds that Flynn has failed to show she will be irreparably harmed in the absence of a temporary restraining order. Failure to show irreparable harm is an independently sufficient ground upon which to deny a temporary restraining order. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *see also Novus Franchising, Inc. v. Dawson*, --- F.3d ----, 2013 WL 3970250, at *7 (8th Cir. 2013). Thus, the Court need not decide, at this time, whether Flynn has demonstrated a probability of success on the merits. Even if Flynn had a strong claim on the merits, preliminary injunctive relief is improper absent a showing of a non-speculative threat of irreparable harm. *Roudachevski*, 648 F.3d at 706. Similarly, although the balance of harms and public interest might favor injunctive relief, they cannot compensate for an absence of irreparable harm.

To show a threat of irreparable harm, the movant must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Id*. Stated differently, the irreparable harm alleged by the movant "must be actual and not theoretical." *Brady v. Nat'l Football League*, 640 F.3d 785, 794 (8th Cir. 2011). Harm is not irreparable when a party can be fully compensated for its injuries through an award of

damages. *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009).

Flynn first argues that she will be irreparably harmed because the removal of her books from Amazon has already and will continue to damage her reputation and the goodwill she has established among her readers. It is true that loss of intangible assets such as reputation and goodwill may constitute irreparable injury. *Id.* But Flynn has failed to offer evidence that she faces an actual, imminent threat of such harm.

Flynn avers that she has "developed an avid fan base and [her] readership expects a new book every two weeks." Filing 9-1 at 2. As a result of the takedown, her readers are unable to purchase her books. Flynn claims that this will damage the goodwill she has built up by virtue of her consistent and frequent publishing schedule. And, Flynn avers, this will likely result in a permanent loss of customers, as her readers will turn elsewhere to meet their reading demands. Filing 9-1 at 6. Flynn also claims that she has "learned of false rumors among [her] readership regarding the reasons" her recent books are not for sale, and asserts that these rumors are likely to permanently damage her professional reputation. Filing 9-1 at 6. None of this suffices to show a threat of irreparable harm. Conclusory statements that customer relationships will be irreparably harmed and goodwill permanently diminished are not a sufficient basis for injunctive relief. *Watkins,* 346 F.3d at 846; *Dotster, Inc. v. Internet Corp. for Assigned Names and Numbers,* 296 F. Supp. 2d 1159, 1164 & n.2 (C.D. Cal. 2003).

First, Flynn has not submitted any proof as to her reputation or goodwill in the relevant market. Lacking such evidence, the Court has no basis upon which to evaluate any harm to these intangible commodities. *See Mirina Corp. v. Marina Biotech,* 770 F. Supp. 2d 1153, 1162 (W.D. Wash. 2011). Similarly, without being informed of the content of the rumors allegedly circulating, the Court has no basis to evaluate Flynn's claim that her reputation may be harmed. *See Valeo Intellectual Property, Inc. v. Data Depth Corp.,* 368 F. Supp. 2d 1121, 1127–28 (W.D. Wash. 2005).

Even if the Court assumes that Flynn has established goodwill and a valuable reputation, there is no evidence that these will be damaged by a temporary delay in the publication of two of Flynn's new works. Speculation that this delay *might* affect her goodwill and reputation are insufficient. *See, e.g., Am. Promotional Events, Inc.--Nw. v. City and Cnty. of Honolulu,* 796 F. Supp. 2d 1261, 1283–84 (D. Haw. 2011). Flynn's claims that she will permanently lose readers to other authors is likewise unsupported by any facts. In some circumstances, a likelihood of irreparable harm may be found based on the "general business principles" applicable to the relevant market. *See Gen. Motors Corp.,* 563 F.3d at 319–20. But Flynn has not offered the

Court any reason to believe that readers in this market will only purchase books from one author, and will not return to Flynn after sampling another author's wares.

Nor is it clear why Flynn's 2-week "business model" is contingent upon these two books, given that this case is about only two books, and they were proffered to Siren in June and made available on Amazon in July and August. Flynn's goodwill argument rests on the premise that she has devoted followers who are waiting for new books, and expect them to arrive on schedule. But presumably, any readers who were anxiously awaiting the timely publication of these two books had the opportunity to acquire them. And by now, in order to keep up her publishing schedule, Flynn would obviously have had to complete and distribute something else. There is nothing to suggest that the parties' dispute over these two books somehow prevents Flynn from continuing to publish other books on her usual schedule. In other words, it is not at all apparent to the Court why the extraordinary remedy of a temporary restraining order is necessary for Flynn to maintain her "business model" by continuing to frequently publish new works.

In short, Flynn has not yet shown a genuine, non-speculative possibility of irreparable harm. Moreover, Flynn has not shown that any harm is truly irreparable in the sense that it could not be addressed through money damages if Flynn is successful following a trial on the merits. *Novus Franchising,* 2013 WL 3970250, at *8. Instead, the Court finds that Flynn's claims of damage to her customer relationships is equivalent to a claim for lost profits, which can be readily compensated. And Flynn has not argued that her damages will be difficult to prove or calculate. To the contrary, she has already provided the Court with what she claims are typical sales figures for her books in the past, and an accounting of her average daily profits for the two books at issue.

Flynn next argues that defendants' violation of a federal statute—the DMCA—allows the Court to presume the existence of irreparable harm to Flynn and the public. This argument is without merit. It is true that, where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction. *Burlington N. R.R. Co. v. Bair,* 957 F.2d 599 (8th Cir. 1992). But this rule only holds true where a statute clearly mandates injunctive relief for a particular set of circumstances; otherwise, courts must apply the traditional equitable considerations (including irreparable harm) in deciding whether to grant relief. *Bedrossian v. Nw. Mem'l Hosp.,* 409 F.3d 840, 843 (7th Cir. 2005); *see also In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litigation,* 340 F.3d 749, 759 (8th Cir. 2003). Flynn has not identified any portion of the DMCA providing for injunctive relief to

remedy or prevent violations of § 512(f), nor has the Court identified any such provision. To the contrary, § 512(f) provides solely for an award of damages.

In sum, the Court finds that Flynn has not demonstrated a sufficient threat of irreparable harm that could not be ameliorated with money damages. And where there is an adequate remedy at law, a temporary restraining order is not appropriate. *Watkins,* 346 F.3d at 844.

## II. Flynn's Request for an Emergency Hearing or Reassignment

Given the Court's finding that Flynn is not entitled to a temporary restraining order at this time, her request for a hearing or reassignment to another United States District Judge is moot. That said, the Court would normally be inclined to accommodate a litigant's request for a hearing, even on short notice. Here, however, Flynn has yet to explain why she believes a hearing is necessary. *See,* Fed. R. Civ. P. 65(b); *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1211 (11th Cir. 2003) (evidentiary hearing not required before issuance of preliminary injunction, absent "bitterly contested" facts or the need for credibility determinations). Flynn has not suggested that a hearing is needed to provide additional evidence, to elucidate the arguments in her brief, or to provide new arguments. Accordingly,

1. Flynn's Motion for Temporary Restraining Order and Request for Hearing (filing 8) is denied; and

2. Flynn's Motion for Emergency Hearing or, Alternatively, Motion for Reassignment (filing 14) is denied as moot.

Dated this 20th day of September, 2013.

BY THE COURT:

_John M. Gerrard_
John M. Gerrard
United States District Judge